UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

AYMAN MAHDY, M.D.
*Individually and as father and*                    Case No. 1:16-cv-845
*Next friend on behalf of J.M.,*

       Plaintiffs,                                      Judge Timothy S. Black

vs.

MASON CITY SCHOOL DISTRICT, *et al.*,

       Defendants.


## ORDER GRANTING IN PART AND DENYING IN PART THE MASON SCHOOL DISTRICT DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (Doc. 30)

This civil action is before the Court on the motion of Defendants Mason City

School District Board of Education ("Mason School District"), Gail Kist-Kline, Melissa

Bly, Erin Bucher, and Michelle Hastings for judgment on the pleadings (Doc. 30) as well

as the parties' responsive memoranda (Docs. 32, 35).

## I.    INTRODUCTION

### A.  The Parties.

Dr. Mahdy is a urologist employed by the University of Cincinnati.  (Doc. 22 at

¶ 65).  He is a native of Egypt and a legal United States Resident.  (*Id.* at ¶¶ 65-66).

Dr. Mahdy's daughter, J.M., was at all times relevant to the Amended Complaint

five years of age, and a student in the Mason School District.  (Doc. 2 at ¶¶ 6, 9).  J.M. is

a U.S. citizen and speaks both English and Arabic.  (*Id.* at ¶¶ 67-68).

Defendant Mason School District is an independent public school district. (Doc. 22 at ¶ 7). The Mason School District and each of its component schools are recipients of federal financial assistance. (*Id.*)

Defendant Gail Kist-Kline is and was at all relevant times the Superintendent of Mason School District. (Doc. 22 at ¶ 8). In that capacity, she holds final policy-making authority for the Mason School District with respect to implementation of all governmental laws, policies, regulations and procedures governing the Mason City Schools, including enforcement of anti-discrimination policies with the Mason School District. (*Id.*) As Superintendent, she had the ability and authority to take corrective action on behalf of the Mason School District to stop discrimination within the district. (*Id.*)

Defendant Melissa Bly is and was at all relevant times the principal of Mason Early Childhood Center ("MECC"). (Doc. 22 at ¶ 9). In that capacity, she held final policy-making authority with respect to implementation and enforcement of all official governmental laws, policies, regulations and procedures governing the MECC, including anti-discrimination policies within the school. (*Id.*) As Principal, she had the ability and authority to take corrective action on behalf of the Mason School District to stop discrimination within the MECC. (*Id.*)

Defendant Erin Bucher is and was at all relevant times an Assistant Principal of the MECC. (Doc. 22 at ¶ 10). In that capacity, acting under color of law, she had the ability and authority to take corrective action on behalf of the Mason School District to stop discrimination within MECC. (*Id.*)

Defendant Michelle Hastings was at all relevant times a full-time employee of MECC, serving in the capacity of classroom teacher. (Doc. 22 at ¶ 11). In that capacity, acting under color of law, she had the ability and authority to take corrective action on behalf of the Mason School District to stop discrimination. (*Id.*)[1]

Defendant Gannett Co., Inc. is a foreign corporation registered to do business within the State of Ohio, and doing business within the Southern District of Ohio as Cincinnati Enquirer/Cincinnati.com. (Doc. 22 at ¶ 12). Gannett also does business within the Southern District of Ohio and nationally as USA Today. (*Id.*)

Defendant Hannah Sparling is a K-12 Education Reporter who writes for Cincinnati Enquirer/Cincinnati.com. (Doc. 22 at ¶ 13). Ms. Sparling wrote the article that gives rise to this lawsuit. (*Id.*)

Defendant Amanda Rossman is a photographer who is employed by Cincinnati Enquirer/Cincinnati.com. (Doc. 22 at ¶ 14). Ms. Rossman took and published the photographs that give rise to this lawsuit. (*Id.*)

Defendant Peter Bhatia is the Editor for Cincinnati Enquirer/Cincinnati.com who approved publication of the article and photographs that give rise to this lawsuit. (Doc. 22 at ¶ 15).[2]

---

[1] Defendants Ms. Kist-Kline, Ms. Bucher, Ms. Bly, and Ms. Hastings are referred to collectively as the "Individual School District Defendants." The Individual School District Defendants and the Mason School District are referred to collectively as the "Mason School District Defendants."

[2] Defendants Gannett Co., Ms. Sparling, Ms. Rossman and Mr. Bhatia are referred to collectively as the "Media Defendants."

### B.  Facts Giving Rise to Plaintiffs' Claims.

On December 2, 2015, Dr. Mahdy went into the break room at University Hospital where he works and was shocked to see a large picture of his 5-year-old daughter, J.M., emblazoned across nearly half the front page of that day's Cincinnati Enquirer.  (Doc. 22 at ¶ 16).  The photograph of his daughter illustrated the lead article ("Article") headlined, "Arabic-speaking kids overwhelm Mason."  (*Id.*)  In the photograph, J.M. wore a name tag with her full name clearly visible.  (*Id.* at ¶ 17).  The caption under the photograph again set forth J.M.'s full name, stating, "[J.M.], a kindergartner in Michelle Hasting's class at Mason Early Childhood Learning Center, works with a student teacher on a reading lesson.  [J.M.]'s first language is Arabic."  (*Id.* at ¶ 18).

The Article focused on a Cincinnati Children's Hospital Medical Center program known as "Destination Excellence" that draws families from overseas to the Cincinnati area for treatment of their seriously ill children, and the financial burden that program is imposing upon the Mason School District.  (Doc. 22 at ¶ 19).  The Article describes that these families are typically transients on temporary visas who float in and out of the Mason community, utilizing school financial resources without paying their fair share of school-funding taxes.  (*Id.*)  The Article suggests that 51 Arabic-speaking students connected with the Destination Excellence program have "overwhelmed" the Mason School District.  (*Id.*)  The Article used the photograph and identification of J.M. by name to illustrate this supposed problem.  (*Id.* at 20).

The Article and photograph were initially published online on December 1, 2015 on the Enquirer's online news service, Cincinnati.com.  (Doc. 22 at ¶ 21).  A print

version, the one Dr. Mahdy first saw, was published in the Cincinnati Enquirer on December 2, 2015.  (*Id.*)  The Article and photograph were also published by USA Today.  (*Id.*)  The story with the original photo was picked up by a number of other websites such as US News.  (*Id.*)  The story and photograph of J.M. have been shared on Facebook by many users, and shared on Twitter.  (*Id.*)  The photograph of J.M. with her full name is now in the Google images cache, the Bing image cache, and the Yahoo image cache.  (*Id.*)  The original picture of J.M. was published again by the Cincinnati.com above a letter from attorney Christopher Pogue explaining the legal errors in the article.  (*Id.*)  The photograph again contains J.M.'s full name, grade, school, teacher, and says that Arabic is her first language.  (*Id.*)

The Article began in this way:  "There was no warning.  'To be forthright, we didn't really realize we had this bubbling up,' said Mason City Schools Superintendent Gail Kist-Kline."  (Doc. 22 at ¶ 41).  The article continued, "[Kist-Kline] was sitting in her office on the second floor of Mason's administrative building, explaining a recent spike in Arabic-speaking students.  (*Id.* at ¶ 42).  The superintendent was open—blunt about what's happening in her schools—but she was also cautious, careful with her phrasing.  It's a sensitive situation, she said.  It's complicated."  (*Id.*)

The Article went on to state that, "This school year, Mason enrolled 135 new English as a Second Language students, 51 of whom—38 percent—speak native Arabic. In the 2014-15 school year, the district had a total of 438 ESL students, 39 of whom—8 percent—spoke Arabic as their first language."  (Doc. 22 at ¶ 43).

The Article identified that, "Primarily, [the new Arabic speakers] hail from Saudi Arabia.  And, as Kist-Kline learned after a bit of digging, most are here on temporary visas for a program at Cincinnati Children's Hospital Medical Center."  (Doc. 22 at ¶ 44).  "That's where it gets tricky," said the article.  "The students and their families are likely on B-1/B-2 visitor visas, which means, according to U.S. law, they may be prohibited from enrolling in school.  However, a conflicting law prohibits school districts from asking students about their citizenship status."  (*Id.* at ¶ 45).

Ms. Kist-Kline opined that the $522,000.00 cost of providing ESL services to these Arabic-speaking students from the Destination Excellence program, whose families are non-residents and only here temporarily, was an unwarranted strain on the Mason School District's $100 million budget.  (Doc. 22 at ¶ 46).  Ms. Kist-Kline asked the School District's attorney what to do, and he said to enroll the students.  (*Id.* at ¶ 47).  She got a second legal opinion, and then a third, and all attorneys said to enroll the students.  (*Id.*)  Not satisfied, Ms. Kist-Kline called the Ohio Attorney General, the Ohio Department of Education, and her state representatives to ask for advice.  (*Id.* at ¶ 48).  She was sent from office to office, and then, finally, back to the Attorney General's office, where she was told they could not offer a legal opinion.  (*Id.*)

The Mason School District enrolls approximately 10,700 students.  (Doc. 22 at ¶ 49).  According to the Article, 483 students were enrolled in Mason's ESL Program during the 2014-2015 school year.  (*Id.* at ¶ 50).  A later estimate by the Mason School District puts the number of students in the ESL Program at more than 600.  (*Id.*)

Prior to being "overwhelmed" by these 51 new Arabic-speaking students, the Mason School District boasted on its website that:

> Mason City Schools proudly welcomes families from all over the world. We currently enroll students from more than 35 countries, and our students speak 65 languages. Our students and teachers appreciate the rich cultural mix that our international families bring to our community and schools. Our staff enjoys helping new students adjust academically and socially through Mason's English as a Second Language Program.

(Doc. 22 at ¶ 51).

But, the Complaint alleges, the Mason School District Defendants viewed these Arabic-speaking students as something new, and to be feared. (Doc. 22 at ¶ 52). According to the Article, Ms. Kist-Kline feared that "something" will go awry, and Mason will be on the hook for serving students who are not supposed to be in school. (*Id.* at ¶ 53). "'That's what keeps me up at night,' Kist-Kline said, 'What if we do something wrong?'" (*Id.* at ¶ 54).

Ms. Kist-Kline stated the Mason School District's policy towards these Arabic-speaking students in this way: "Dollars aside, Kist-Kline doesn't think Mason is the best place for Destination Excellence children. Their needs—medical, emotional, social—are outside the District's expertise. And if they're going back to their home countries in a year or two or less, a stint of traditional American schooling might not help them much long term. 'Honestly, that's where my heart is," [Ms. Kist-Kline] said. 'Our program isn't best serving these families.'" (Doc. 22 at ¶ 57).

### C. Plaintiffs' Complaint.

The Complaint alleges that neither Dr. Mahdy nor his wife gave permission to anyone to photograph J.M., to disclose her identity to the public, or to falsely associate her with the Children's Hospital Destination Excellence Program. (Doc. 22 at ¶ 72). The Complaint alleges that J.M. had to be removed from MECC due to the "wave of Islamophobia that is currently sweeping across our country," and because her family was "so distressed over the prejudice and discriminatory treatment expressed against Arabic-speaking students." (*Id.* at ¶¶ 24, 90.).

The Complaint alleges that the Mason School District Defendants acted jointly with the Media Defendants to have the article with J.M.'s picture published. (Doc. 22 at ¶¶ 106-113). The Complaint asserts that publication of J.M.'s photograph in connection with the Article portrayed J.M. and her family in a false light and violated Title VI of the Civil Rights Act of 1964, the Fourteenth Amendment's Equal Protection Clause, and the First Amendment's Free Exercise Clause.

The Mason School District Defendants move the Court for an Order granting judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

## II.  STANDARD

The standard of review for a Rule 12(c) motion is the same as for a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the

moving party is nevertheless clearly entitled to judgment." *Id.* (*citing JPMorgan Chase Bank v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)).

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id.* (*citing* Fed. Rule Civ. P. 8(a)(2)).

## III.    ANALYSIS

### A.  Count One: Violation of Title VI.

Count One alleges the Mason School District violated Title VI of the Civil Rights Act of 1964, which provides:

> [n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.  The Complaint asserts the following facts in support of the Title VI claim:

79. The Mason City School District is a recipient of federal funds as that term is used in Title VI, and thus subject to the provisions of that law.

80. J.M. is a "person" as that term is used in Title VI.

81. Mason City Schools Superintendent Gail Kist-Kline contacted the Cincinnati Enquirer to express her concerns and fears over the 51 new Arabic-speaking students in the 10,700 Mason School District student population.

82. Gail Kist-Kline, Principal Melissa Bly, Assistant Principal Erin Bucher, and Kindergarten Teacher Michelle Hastings gave access to reporter Hannah Sparling and photographer Amanda Rossman from the Cincinnati Enquirer/Cincinnati.com, who entered the kindergarten classroom and photographed J.M. to illustrate the offending article.

83. On information and belief, Teacher Michelle Hastings placed a name tag on J.M.'s chest, and provided J.M.'s full name to the Enquirer, Ms. Sparling and Ms. Rossman, who then published J.M.'s full name and photograph in the Enquirer, Cincinnati.com, and USA Today.

84. Focusing on 51 Arabic-speaking students out of an English as a Second Language Program student population of over 483 students (the number may actually be more than 600 students enrolled in Mason's ESL program), and out of a total student population of approximately 10,700, was an intentional act of prejudice and discrimination based upon the race (Arab), color (brown-skinned), and national origin (countries having predominantly Muslim populations).

85. Presenting J.M. to the media, and encouraging or allowing the media to use J.M.'s name and photograph, apparently as a generic Arab-type girl to illustrate the offending article, was a further intentional act of prejudice and discrimination based upon J.M.'s actual or perceived Arab race, color, and national origin from a region of the world that is predominantly Muslim.

86. The actions of these four Mason City School District officials in bringing the media into their classroom, and in presenting J.M. to the media as a generic Arab-type girl to illustrate their complaints, were motivated by an intent to discriminate, and to enlist community support of their efforts to rid the Mason City School District of the 51 Arabic-speaking students who had recently enrolled in its ESL program.

87. And for these four Mason City School District officials to single out the Arabic-speaking students as the source of ESL budget strains, when approximately 500-600 other students who speak 64 other languages are enrolled in the program, was to specifically classify Arabic speaking students from predominantly Muslim countries, to treat them differently from other students, and to thereby deny them equal protection and freedom from invidious discrimination.

88. The Superintendent, Principal, Assistant Principal, and Kindergarten Teacher are all persons employed by the Mason City School District who had the power to take corrective action to end the discrimination against Arab-speaking students.

89. Mason City School District is therefore liable under Title VI for their unlawful discriminatory actions.

(Doc. 22 at ¶¶ 79-89).

The Mason School District Defendants argue this claim fails as a matter of law because the Complaint only alleges wrongdoing by four individuals—Ms. Kist-Kline, Ms. Bly, Ms. Bucher, and Ms. Hastings—and not the Mason School District. (Doc. 30 at 9-10).

The Court agrees. In a Title VI case, the proper defendant "is an entity rather than an individual." *Brooks v. Skinner*, 139 F. Supp. 3d 869, 881 (S.D. Ohio 2015) (quotation omitted). There is no vicarious liability under Title VI; the entity cannot be held liable for the discrimination of its individual employees. *Thompson v. Ohio State Univ.*, 990 F. Supp. 2d 801, 817 (S.D. Ohio 2014) ("there is no vicarious liability under Title VI, meaning that OSU cannot be held liable for discrimination solely based on the conduct of the Individual Defendants"); *Foster v. Michigan*, 573 Fed. Appx. 377, 389 (6th Cir. 2014) (affirming dismissal of Title VI discrimination claims against Michigan and the Michigan Department of Transportation because "there is no vicarious liability under Title VI" and the complaint lacked "fact-based allegations that either MDOT or the State of Michigan participated in, was aware of, or was deliberately indifferent to any discriminatory acts.").

Here, the Complaint argues that the Mason School District is liable for the unlawful discriminatory actions of Ms. Kist-Kline, Ms. Bucher, Ms. Hastings and Ms. Bly. (Doc. 22 at ¶¶ 88-89). That claim, which attempts to hold the Mason School District liable for the alleged wrongs of individual agents of the entity, fails as a matter of law. *Thompson*, 990 F. Supp. 2d at 817; *Foster*, 573 Fed. Appx. at 389.

Dr. Mahdy argues the Individual School Defendants were "policy-making officials of the [Mason School District], who all had the power to take corrective action and to end

the discrimination against Arabic-speaking students," and accordingly, their alleged intentional discrimination can be attributed to the Mason School District. (Doc. 32 at 6).

This argument is not well-taken. The Supreme Court has expressly held that when a school district's liability rests on the district having "actual notice" of the wrongdoing, <u>the knowledge of the wrongdoer is not pertinent to the analysis</u>. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998).

In *Gebser*, a teacher engaged in a sexual relationship with one of his high school students. 524 U.S. at 277-78. Plaintiff filed suit against the school district for, *inter alia*, violation of Title IX.[3] The Supreme Court held that damages may not be recovered against the school district for the teacher's behavior "unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's conduct." *Id.* at 277. The Supreme Court rejected the suggestion that the teacher had "actual notice of" and was "deliberately indifferent to" his own abusive conduct, holding "[w]here a school district's liability rests on actual notice principles, however, the knowledge of the wrongdoer himself is not pertinent to the analysis." *Id.* at 291.

The Supreme Court in *Gebser* explained that the private right of action under Title IX is a judicially created remedy, and holding a school district liable for damages based on the actions and knowledge of the wrongdoer alone would contravene the express

---

[3] While *Gebser* concerned a violation of Title IX, "[t]he language of Title IX is virtually identical to the language of Title VI." *Davis v. Monroe County Bd. of Educ.*, 120 F.3d 1390, 1398 (11th Cir. 1997). Accordingly, courts interpret Title VI and Title IX consistently with one another. *T.E. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 355 at n. 11 (S.D. N.Y. 2014).

administrative remedy created by Congress, which states "no such [Federal administrative] action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with [Title IX] and has determined that compliance cannot be secured by voluntary means."[4] *Id.* at 288. The Supreme Court reasoned that "[i]t would be unsound . . . for a statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance while a judicially *implied* system of enforcement permits substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice." *Id.* at 289-90.

Dr. Mahdy argues *Gebser* is distinguishable because "[t]he *Gebser* analysis typically comes into consideration when some low-ranking school district employee, who is not in a supervisory or policy-making position . . . is the one who is committing the unlawful discriminatory acts." (Doc. 32 at 9). Dr. Mahdy argues that *Gebser* does not apply here, where the school district officials who have the power to correct discrimination are the ones who are accused of actually committing the discriminatory acts. (*Id.* at 9-10).

The Fifth Circuit Court of Appeals recently rejected this precise argument in *Salazar v. S. San Antonio Indep. Sch. Dist.*, 690 Fed. Appx. 853 (5th Cir. 2017). In that case, Salazar sued the South San Antonio Independent School District for damages under Title IX alleging that he was molested by Alcoser, a vice principal and subsequently a

---

[4] Title VI contains a nearly identical provision for Federal administrative remedial action. *See* 42 U.S.C. § 2000d-1.

principal of elementary schools in the district. 690 Fed. Appx. at 854. The district court entered a judgment in favor of Salazar and against the school district; the school district appealed. *Id.*

On appeal, Salazar argued—just like Dr. Mahdy argues here—that "Alcoser was 'an official of the school district who at a minimum ha[d] authority to institute corrective measures on the district's behalf' and had 'actual notice of' and was 'deliberately indifferent to' his own abusive conduct. Therefore, Salazar insists, the District is liable because Alcoser's conduct was the District's conduct by virtue of his authority to redress discrimination on the basis of sex." *Id.* at 857.

The Fifth Circuit rejected Salazar's argument, finding that imputing knowledge to the school district just because the wrongdoer himself had corrective authority would contravene the Supreme Court's holding and reasoning in *Gebser* as well as the express remedial scheme provided by Congress:

> a perpetrator of sexual abuse who also "has authority to institute corrective measures on the district's behalf," within the meaning of *Gebser*, is highly unlikely either to take "corrective measures on the district's behalf" or to report his own criminal behavior to another school district official who is authorized to take corrective measures. In contrast, if a school district official with authority to remedy discrimination proscribed by Title IX was not a perpetrator and became aware that a district employee had sexually abused a student, it could reasonably be expected that the official with remedial authority would take action and would not exhibit deliberate indifference to the victimization of a student.

> But more importantly, implying a right of action under Title IX that would permit recovery of damages from a funding recipient <u>when only the person who committed sexual abuse had actual knowledge of his intentional misconduct would be contrary to the statutory intent expressed in 20 U.S.C. § 1692</u>. . . . which provides that federal funding or financial assistance cannot be terminated or withheld unless "the department or agency

> concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." It is unreasonable to construe § 1682 to mean that an employee of a school district who committed sexual abuse . . . would be an "appropriate person or persons" concerning that sexual abuse. <u>When an individual's intentional conduct constitutes the discrimination, the directive to "advise[]" an appropriate person "of the failure to comply" connotes that the "appropriate person" is unaware of the misconduct.</u>

*Id.* at 858-59 (emphasis added).

Here, Count One of the Complaint seeks to hold the Mason School District liable for the alleged intentional discrimination of the four Individual School District Defendants when they are the <u>only</u> agents of the Mason School District that the Complaint alleges knew of the wrongful conduct. (Doc. 22 at ¶¶ 88-89). Plaintiffs' attempt fails as a matter of law. The knowledge of the Individual School District Defendants—the alleged wrongdoers—cannot be attributed to the Mason School District, regardless of their official titles. *Gebser*, 524 U.S. at 291; *Salazar v.* 690 Fed. Appx. 858-59. The Mason School District Defendants' motion to for judgment on the pleadings (Doc. 30) is **GRANTED** as to Count One of the Complaint.

**B. Count Two: 42 U.S.C. § 1983.**

Count Two asserts a claim under 42 U.S.C. § 1983 against the Mason School District Defendants. To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States. *Dean v. Byerley*, 354 F.3d 540, 546 (6th Cir. 2004). The Compliant argues that the Mason School District Defendants deprived J.M. of her right to

the free exercise of religion under the First Amendment and the right to equal protection under the Fourteenth Amendment.  (Doc. 22 at ¶¶ 93-118).

    1.  *Free Exercise.*

The First Amendment states that "Congress shall make no law… prohibiting the free exercise [of religion]."  U.S. Const., amend. I.  The Sixth Circuit has held the Free Exercise Clause is "predicated on coercion."  *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017) (citation omitted); *see also Sch. Dist. Of Abington Twp. v. Schempp*, 374 U.S. 203, 223 (1963) ("The Free Exercise Clause . . . withdraws from legislative power, state and federal, the exertion of any restraint on the free exercise of religion.  Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority.").  A litigant suffers an injury to her free exercise rights when the state compels her "to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion."  *Nikolao*, 875 F.3d. at 316.  Hence, it is necessary in a free exercise case for one to show that official conduct "operates against [her] in the practice of [her] religion."  *Schempp*, 374 U.S. at 223.

Here, the Complaint does not allege that the Mason School District Defendants infringed the free exercise of J.M.'s religion.  The Complaint does not allege that the Mason School District Defendants compelled J.M. to do or refrain from an act forbidden or required by her religion.  Because there is no allegation that the Mason School District Defendants "operated against [J.M.] in the practice of [her] religion," the free exercise claim fails as a matter of law.  *Schempp*, 374 U.S. at 223; *see also Nikolao*, 875 F.3d at 316 (ordering dismissal of plaintiff's free exercise claim because "she has given no

indication that the [official conduct] *coerced her* into doing or not doing anything.").
Accordingly, the Mason School District Defendants' motion for judgment on the
pleadings (Doc. 30) is **GRANTED** as to Count Two, to the extent it is premised on a
violation of the Free Exercise Clause.

    2. *Equal Protection*.

The Fourteenth Amendment provides that "[n]o state shall . . . deny to any person
within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV. To
state a claim under § 1983 based upon a violation of the Equal Protection Clause, a
plaintiff must allege that a state actor intentionally discriminated against the plaintiff
because of membership in a protected class. *Thompson v. Ohio State Univ.*, 990 F. Supp.
801, 814-15 (6th Cir. 2014).

Here, the Complaint alleges that the Mason School District Defendants acted in
their official capacities when they discriminated against J.M. on the basis of her race,
color, national origin, and religion by creating negative publicity about the Arabic-
speaking students in Mason schools. (Doc. 22 at ¶¶ 97-110). At this juncture, those
allegations are sufficient to state a plausible violation of the Equal Protection Clause.[5]
Accordingly, the Mason School District Defendants' motion for judgment on the
pleadings (Doc. 30) is **DENIED** as to Count Two, to the extent it is premised on a

---

[5] According to the sections of the Article that are cited in the Complaint, the Article's focus is on
language (Arabic), not race or religion. However, the Court is cognizant that "when a
government official uses as a criterion for decision a person's ability to speak a *particular*
language that is closely associated with a specific ethnic group, that fact may "raise[] a plausible,
though not a necessary, inference that language might be a pretext for what in fact were race-
based" actions. *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 540
(6th Cir. 2002).

violation of the Equal Protection Clause.

## C.  Count Three: False Light.

Count Three of the Complaint alleges the Individual School District Defendants

acted in concert with the Media Defendants to falsely portray J.M. and her family as:

(1) non-U.S. residents, and non-U.S. citizens;

(2) here on temporary visas;

(3) Saudi Arabians here for pediatric medical treatment at Children's Hospital;

(4) People who can't speak or can barely speak English;

(5) Transient;

(6) Non-taxpaying;

(7) Illegally attending Mason Schools in violation of U.S. immigration laws;

(8) Draining scarce financial resources from the Mason City School District; and

(9) Part of an influx of 51 new Arabic-speaking students who threaten to "overwhelm" the Mason City School system with their ESL, medical, social and financial needs.

(Doc. 22 at ¶ 120).  The Complaint alleges that the Individual School District Defendants,

in publicizing J.M.'s picture in connection with the article, "falsely associated J.M. with

all of the foregoing attributes."  (*Id.* at ¶ 122).

The Individual School District Defendants argue this claim fails because the

Complaint does not allege that the Individual School District Defendants publicized any

false information about the Plaintiff.   (Doc. 30 at 12-14).  The Court does not agree.

As explained by the Supreme Court of Ohio, "[o]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Welling v. Weinfeld* (2007), 113 Ohio St. 3d 464, 467 (citation omitted). The "false light" cause of action requires that the matter published concerning the plaintiff not be true. *Mushkat v. Pickawillany Condominium*, 10th Dist. Franklin No. 80AP-765, 1981 Ohio App. LEXIS 11014, at ** 6-7 (1981).

One form in which false light claims appear is "the use of another's photograph to illustrate an article or book with which the person has no reasonable connection, and which places the person in a false light." *Crump v. Beckley Newspapers*, 173 W. Va. 699, 715, 320 S.E. 2d 70, 86 (1983) (female coal miner whose photograph was used in connection with a newspaper article on harassment in the mining industry had false light claim because she had not been harassed); *see also Cheney v. Daily News L.P.*, 654 Fed. Appx. 578, 580 (3d Cir. 2016) (plaintiff, a Philadelphia firefighter, had a false light claim when his photograph was placed next to article titled "Heated Sex Scandal Surrounds Philadelphia Fire Department" because a reasonable reader could understand the article to be about the plaintiff); Restatement (Second) of Torts, § 652E, cmt. b., ill. 2 ("A is a taxi driver in the city of Washington. B Newspaper publishes an article on the practices of Washington taxi drivers in cheating the public on fares, and makes use of A's photograph to illustrate the article, with the implication that he is one of the drivers who

engages in these practices.  A has never done so.  B is subject to A for . . . invasion of privacy.").

Here, the Complaint asserts that the Individual School District Defendants, in publicizing J.M.'s photograph and the fact that she speaks Arabic in connection with the Article, falsely associated her and her family with the negative comments regarding Arabic-speaking students in Mason schools stated or implied in the Article.[6]  These allegations are sufficient to state a claim for false light.  Whether the juxtaposition of J.M.'s photograph with the Article actually placed J.M. and/or her family in a false light, and whether that false light would be highly offensive to a reasonable person, are questions of fact for the jury.  *Crump*, 320 S.E.2d at 90 ("when the communication involved in a false light claim does not clearly favor one construction over another, the determination of what light it places the plaintiff is for the jury.").  Accordingly, the Mason School District Defendants' motion for judgment on the pleadings (Doc. 30) is **DENIED** as to Count Three.

---

[6] The Individual School District Defendants argue they did not "publicize" anything, as they did not publish the Article.  (Doc. 30 at 12).  This argument fails.  A false light claim does not require the plaintiff to show the defendant published any information, only that it gave publicity to that information.  *See Welling,* 113 Ohio St. 3d at 467.  The Complaint alleges that the Individual School District Defendants encouraged the Media Defendants to write about the "problem" of Arabic-speaking students in Mason schools, and acted in concert to associate J.M. with this "problem."  (Doc. 22 at ¶¶ 110; 120-27).  Presenting information to the press for publication can meet the "publicity" element of a false light claim.  *See Mishak v. Serazin*, Case No. 1:17-cv-1543, 2018 U.S. Dist. LEXIS 20222, at **24-25 (N.D. Ohio Feb. 7, 2018) (plaintiff sufficiently pled the "publicity" element by alleging "[Defendant] purposely summoned the press to his office and purposely provided [reporter] with the suspension letter and termination letter, both drafted by [defendant], containing many false and defamatory statements about [plaintiff], thereby giving great publicity to these statements with their subsequent publication[.]").

## IV.    CONCLUSION

For the foregoing reasons, the Mason School District Defendants' Motion for

Judgment on the pleadings (Doc. 30) is **GRANTED IN PART** and **DENIED IN PART**.

Specifically, the Motion (Doc. 30) is:

1.    **GRANTED** in favor of Defendants Ms. Kist-Kline, Ms. Bucher, Ms. Bly, Ms. Hastings, and the Mason City School District Board of Education as to Count One, for violation of Title VI;

2.    **GRANTED** in favor of Defendants Ms. Kist-Kline, Ms. Bucher, Ms. Bly, Ms. Hastings, and the Mason City School District Board of Education as to Count Two, to the extent based on the Free Exercise Clause;

3.    **DENIED** as to Count Two, to the extent based on the Equal Protection Clause; and

4.    **DENIED** as to Count Three, for false light.

**IT IS SO ORDERED**.

Date:  March 15, 2018

Timothy S. Black
United States District Judge